IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JAMOIA WALKER**, as guardian ad litem for K.B., a minor,<br><br>    Plaintiff,<br><br>  v.<br><br>**PORTLAND PUBLIC SCHOOL DISTRICT NO. 1J**, an Oregon public school district, **FIRST STUDENT, INC.**, an Ohio corporation, **SUSAN KOSMALA**, **MICHAEL LAFRAMBOISE**, and **JOHN GRAPPONE**,<br><br>    Defendants. | Case No. 3:21-cv-01349-IM<br><br>**OPINION AND ORDER GRANTING DEFENDANTS PORTLAND PUBLIC SCHOOL DISTRICT NO. 1J, SUSAN KOSMALA, AND MICHAEL LAFRAMBOISE'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** |

Kimberly Hope Sherman, Education, Environmental, & Estate Law Group LLC, P.O. Box 728, Eugene, OR 97440. Attorney for Plaintiff.

J. Michael Porter and Souvanny Miller, Miller Nash LLP, 111 SW Fifth Avenue, Suite 3400, Portland, OR 97204. Attorneys for Defendants Portland Public School District No. 1J, Susan Kosmala, and Michael LaFramboise.

**IMMERGUT, District Judge.**

  Jamoia Walker ("Walker") brings this action as the guardian ad litem for K.B.,[1] a minor

---

[1] For ease of reference, this Court refers to K.B. as "Plaintiff" in this Opinion.

PAGE 1 – OPINION AND ORDER

child, who attended school at Portland Public School District No. 1J ("PPS"). This Court

previously granted a Motion to Dismiss Plaintiff's Amended Complaint, ECF 27, filed by

Defendants PPS, Susan Kosmala, and Michael LaFramboise (collectively, "PPS Defendants")

but gave Plaintiff leave to amend as to Plaintiff's claims under 42 U.S.C. § 1983. ECF 52 at 11.

Before this Court is PPS Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint.

ECF 62. This Court finds that the Second Amended Complaint fails to cure the deficiencies this

Court identified with the First Amended Complaint. Accordingly, PPS Defendants' Motion to

Dismiss, ECF 62, is GRANTED.

## BACKGROUND

The following allegations are taken from Plaintiff's Second Amended Complaint. ECF

57. This case arises out of the alleged mistreatment Plaintiff suffered while riding a school bus

on October 4, 2016.[2] *Id.* at ¶ 28. At that time, Plaintiff was a second-grade student enrolled in the

Pioneer Behavior Program, a public-school placement program within Buckman Elementary

School and PPS for students with significant behavioral challenges. *Id.* at ¶¶ 4, 8, 17, 19–20.

Plaintiff had multiple disabilities, including autism, emotional disturbances, behavioral disorders,

and difficulty communicating. *Id.* at ¶ 4. Plaintiff received special education services and had an

Individualized Education Program ("IEP"). *Id.* at ¶¶ 4, 17. At the time of the events in question,

Defendant Michael LaFramboise ("LaFramboise") was the principal of the Pioneer Behavior

Program, and Defendant Susan Kosmala ("Kosmala") was the principal of Buckman Elementary

School. *Id.* at ¶¶ 8–9. Both Kosmala and LaFramboise were PPS employees. *Id.*

For the start of his second-grade year, Plaintiff was assigned to Bus 411/Route 451

---

[2] The parties agree that the incident in question occurred on either October 3, 2016 or
October 4, 2016, *see* ECF 57 at ¶ 76, but for ease of reference, and consistent with the parties'
briefing, this Court refers to the incident as occurring on October 4, 2016.

("bus") for transportation to and from school. *Id.* at ¶ 23. Plaintiff began riding the bus on September 6, 2016—the first day of school. *Id.* The bus was operated by Defendant First Student, Inc. ("First Student"), a private transportation organization, through a contract with PPS. *Id.* at ¶ 6. The bus was driven by Defendant John Grappone ("Grappone"), a First Student employee. *Id.* at ¶ 7.

Due to his disabilities, Plaintiff had difficulty managing his emotions and behaviors in a safe manner and reacted to negative interactions with peers by punching, kicking, spitting, biting, swearing, running from staff, taunting his peers, throwing objects, crying, yelling, or thrashing on the floor. *Id.* at ¶ 18. In September 2016, Walker, Plaintiff's guardian, became aware that other students on the bus were bullying Plaintiff. *Id.* at ¶ 24. However, the Second Amended Complaint concedes that during the month of September, Walker "was not aware of the frequency and duration of the bullying" on the bus. *Id.* Nonetheless, the Second Amended Complaint alleges that Walker spoke with Kosmala "on multiple occasions" between September 6, 2016 and the incident on October 4, 2016 about student bullying on the bus and the need for an aide on the bus. *Id.* at ¶ 25. Kosmala assured Walker in early September that she was "looking into placing an aide" on the bus. *Id.* at ¶ 26. Also in September, Walker asked Kosmala if all of the parents and students from the bus could meet together with Walker and Plaintiff to discuss the bullying incidents. *Id.* at ¶ 27. Kosmala responded that she believed that "one of the guardians of one of the other children would 'not be able to handle it.'" *Id.* Rather than speak to them as a group, Kosmala stated that she would speak with other students and their parents individually. *Id.*

On or about October 4, 2016, Grappone called Walker during Plaintiff's bus ride from school, reported that Plaintiff was "out of control," and informed Walker that she needed to

come meet the bus and remove Plaintiff from the bus. *Id.* at ¶¶ 28–29. Grappone subsequently called Bus Dispatch and then the police and requested that police officers meet the bus, which they did. *Id.* at ¶¶ 30–31. When Walker arrived at the scene, the bus had already left. *Id.* at ¶ 32. Walker called Bus Dispatch and asked if it "was the bus company's policy to call the police on a seven-year-old boy who was being bullied," and the dispatcher replied that it was. *Id.*

Walker spoke with LaFramboise after the October 4, 2016 incident—during this conversation, LaFramboise reported that "he had been aware of multiple incidents of unsafe student behaviors on the bus prior to the October 4, 2016 incident." *Id.* at ¶¶ 34–35. LaFramboise informed Walker that, at times, PPS staff had met the bus en route "to assist in managing student behaviors" and that he had, on multiple occasions, heard radio communications regarding disturbances on the bus and that he prepared to travel to meet the bus on many such occasions but "decided not to." *Id.* at ¶¶ 39–40. LaFramboise had heard the radio call on October 4, 2016 and was preparing to travel to meet the bus, but was told by PPS Transportation not to respond to the incident. *Id.* at ¶ 41. Kosmala also reported to Walker that she had, on several occasions, driven out to meet the bus en route to help manage student behavior and either ride on the bus or remove a child and drive the child back to the school. *Id.* at ¶¶ 36–37.

The bus was equipped with video surveillance technology, *see id.* at ¶ 55, and on or around October 4, 2016, Walker asked Kosmala to provide her with videos of the bullying that took place on the bus, *id.* at ¶ 56. However, because the videos contained images of other students, Walker was told that PPS could not release the videos to her, *id.*; nonetheless, Kosmala "transcribe[d]" the videos for Walker and, on November 10, 2016, provided her with a transcription for a portion of the bus video dated October 4, 2016, *id.* at ¶¶ 58–59. In March 2017, LaFramboise provided Walker with two additional transcripts dated "10-9-2016" and "10-

3-2016." *Id*. at ¶ 60. On March 24, 2017, Walker "formally requested that PPS preserve the videos relating to bus trips between September 26 and October 15, 2016" and any other videos that had been distributed to administrators regarding Plaintiff and incidents on the bus. *Id*. at ¶ 66.

Over three years later, at some point between December 21, 2019 and January 5, 2020, Plaintiff allegedly disclosed to Walker that his bus driver had held him down and that "he was pushed into the seat with his face down and arms behind his back two times." *Id.* at ¶ 68. On February 11, 2020, Walker renewed her request to PPS for video footage, *id*. at ¶ 70, and on or about May 28, 2020, Walker received three videos, which roughly aligned with the three transcripts she had previously received, *id*. at ¶ 72.

The first video is labeled "451_09202016_Buckman_AM." *Id.* at ¶ 73. While this label suggests that the video shows the bus ride on September 20, 2016, the transcript that matches the audio on this video is labeled as "10/9/2016." *Id.* This video purportedly shows other students teasing and taunting Plaintiff. *Id*. at ¶ 74. Eventually, Plaintiff leaves his seat and begins to hit another student. *Id*. At that point, Grappone pulls the bus over, picks up Plaintiff, and physically returns him to his seat. *Id*. According to Plaintiff, Grappone did "not employ any approved methods of safe holds," and his "voice and body language [were] amplified[,] . . . aggressive[,] and loud." *Id.* at ¶ 75.

A second video is labeled "451_10032016_Buckman_PM." *Id*. at ¶ 76. While this label suggests that the video shows the bus ride on October 3, 2016, the transcription of the audio for this video is labeled "10/4/2016." *Id*. Plaintiff alleges that this video shows the incident in question, *see id*., which this Court refers to as the October 4, 2016 incident. According to the Second Amended Complaint, during this bus ride, multiple students tease and taunt Plaintiff, and

Grappone takes no action. *Id*. After about four minutes, Plaintiff says something to the students and yells; Grappone tells Plaintiff to "relax," but otherwise takes no further action. *Id*. at ¶ 77. After about another minute of the teasing and name-calling by the other children, Grappone tells Plaintiff to "calm down" but still does not intervene. *Id*. at ¶ 78. The other children continue "screaming insults" at Plaintiff for another ten minutes. *Id*. Grappone ignores the other students until Plaintiff responds, at which point Grappone scolds Plaintiff. *Id*.

After about another fifteen minutes, Plaintiff leaves his seat, and a fight ensues between Plaintiff and the other students. *Id*. at ¶ 79. Grappone then parks the bus and "pulls [Plaintiff's] shoulders back to disengage [him] from the other student," but Plaintiff begins to struggle against Grappone, kicking at him and struggling to free his arms. *Id*. at ¶¶ 79–80. Grappone subsequently "lifts [Plaintiff] by his shoulders, picks him up off the bus bench where he had been standing, and forces [him] into the seat." *Id*. at ¶ 81. Grappone "continues to press his body against [Plaintiff] in the seat while he contacts Bus [D]ispatch for assistance." *Id.* During this time, Plaintiff yells that he can't breathe and that Grappone is hurting him. *Id.* at ¶¶ 81–82. Grappone responds that he is not, that he is "just holding [Plaintiff's] legs down." *Id.* Grappone then puts Plaintiff's hands "in a cross-wrist pincer hold." *Id.* at ¶ 83. When Plaintiff yells that Grappone is hurting him, Grappone turns to face the surveillance camera and says to the camera "I'm restraining him very lightly on the camera." *Id*. Police officers eventually arrive at the scene. *Id*. at ¶ 84.

A third video is labeled "451_10032016_Buckman_PM _2," *id.* at ¶ 86, indicating that it shows the bus ride on October 3, 2016. The transcription of the audio for this video is also labeled "10/03/2016." *Id.* at ¶ 87. The video appears to show the time period directly following the incident shown in the second video. *Id.* at ¶ 86. Plaintiff is wearing the same clothes as in the

second video, and there is mention of the police being called. *Id.* The video shows Plaintiff "subdued in his seat" for the entire video. *Id.*

Plaintiff filed this action in federal court on September 13, 2021 against PPS Defendants, First Student, and Grappone. ECF 1. On November 25, 2021, Plaintiff filed a First Amended Complaint, alleging federal claims under 42 U.S.C. § 1983 against PPS Defendants, First Student, and Grappone as well as state law claims for negligence against PPS, First Student, and Grappone, assault and battery, abuse of a vulnerable person, and intentional infliction of emotional distress against First Student and Grappone, and spoliation against PPS. ECF 24 at ¶¶ 101–320. PPS Defendants and First Student moved to dismiss. ECF 27; ECF 30. First Student also moved for a more definite statement under Rule 12(e) and to strike portions of Plaintiff's complaint under Rule 12(f). ECF 30. This Court granted PPS Defendants' motion to dismiss for failure to state a claim as to Plaintiff's state law negligence claims and spoliation claims with prejudice. ECF 52 at 23–24. However, this Court gave Plaintiff leave to amend his federal claims. *Id.* at 11–12. This Court denied First Student's motion to dismiss for violation of Rule 8 and Rule 10, *id.* at 8, 10–11, and denied First Student's motion to strike, *id.* at 10. However, this Court granted First Student's motion for a more definite statement as to Plaintiff's deliberate indifference claim. *Id.* at 9. On September 9, 2022, Plaintiff filed a Second Amended Complaint. ECF 57. PPS Defendants again move to dismiss Plaintiff's Second Amended Complaint for failure to state a claim. ECF 62.

## LEGAL STANDARDS

A motion brought under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint

lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation omitted). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

**DISCUSSION**

Plaintiff's Second Amended Complaint asserts two claims under 42 U.S.C. § 1983 against PPS Defendants for excessive force and deliberate indifference. In Claim 1.1, Plaintiff asserts a Fourth Amendment excessive force claim under a *Monell* theory against PPS. ECF 57 at ¶¶ 100–128. In Claims 2.1 and 2.3, Plaintiff asserts a Fourteenth Amendment deliberate indifference claim under a *Monell* theory against PPS, *id.* at ¶¶ 142–163, and under a supervisory liability theory against Kosmala and LaFramboise, *id.* at ¶¶ 176–197.

The constitutional harm alleged in each of Plaintiff's claims against PPS relates to Grappone's alleged use of excessive force against Plaintiff. While Plaintiff alleges that Kosmala and LaFramboise were deliberately indifferent to student bullying on the bus, Plaintiff contends that this hostile environment led to Plaintiff's reactions to his peers and ultimately to Grappone's alleged violation of Plaintiff's constitutional rights. *See, e.g., id.* at ¶ 149, 193–94. Indeed, in Plaintiff's Second Amended Complaint, Plaintiff explains that after reviewing the transcripts provided by PPS, Walker continued to believe that the issues on the bus stemmed from bullying by other students, and not from Grappone's conduct, *id.* at ¶¶ 50, 61, 67, and it wasn't until Walker learned of Grappone's conduct over three years later that Plaintiff brought this action, *id.* at ¶ 68. Plaintiff's briefing further clarifies that the basis for Plaintiff's claims is Grappone's conduct. *See, e.g.*, ECF 66 at 3 ("PPS can be held directly liable for the actions of its contractors[.]"); *id.* at 5 ("Fourteenth Amendment claims may be brought against PPS for the acts of First Student and Grappone."); *id.* at 10 ("Kosmala and LaFramboise are liable for the harms inflicted by Defendant Grappone . . . .").

PPS Defendants move to dismiss all claims against them for failure to state a claim. ECF 62. Because each of Plaintiff's claims against PPS flows from the alleged acts and omissions of

PPS employees, Kosmala and LaFramboise, this Court begins with Plaintiff's claim for

individual liability against Kosmala and LaFramboise.

## A.  Claim 2.3: Deliberate Indifference Claim (Supervisory Lability) against Defendants Kosmala and LaFramboise

To state a claim under Section 1983, a plaintiff must allege "(1) acts by the defendants

(2) under color of state law (3) depriving [him] of federal rights, privileges[,] or immunities (4)

[and] causing [him] damage." *Shoshone-Bannock Tribes v. Fish & Game Comm'n, Idaho*, 42

F.3d 1278, 1284 (9th Cir. 1994). "In order for a person acting under color of state law to be

liable under section 1983 there must be a showing of personal participation in the alleged rights

deprivation: there is no respondeat superior liability under section 1983." *Jones v. Williams*, 297

F.3d 930, 934 (9th Cir. 2002). Because there is no respondeat superior liability under Section

1983, Kosmala and LaFramboise may be held liable only "if there exists either (1) his or her

personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

between the supervisor's wrongful conduct and the constitutional violation." *Starr*, 652 F.3d at

1207 (citation omitted).

The Ninth Circuit has explained that "[s]upervisory liability is imposed against a

supervisory official in his individual capacity for his own culpable action or inaction in the

training, supervision, or control of his subordinates, for his acquiescence in the constitutional

deprivations of which the complaint is made, or for conduct that showed a reckless or callous

indifference to the rights of others." *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d

1175, 1183 (9th Cir. 2007) (alteration in original) (citation omitted). "[T]he claim that a

supervisory official knew of unconstitutional conditions and culpable actions of his subordinates

but failed to act amounts to acquiescence in the unconstitutional conduct of his subordinates and

is sufficient to state a claim of supervisory liability." *Keates v. Koile*, 883 F.3d 1228, 1243 (9th

Cir. 2018) (internal quotation marks and citation omitted).

PPS Defendants move to dismiss Plaintiff's supervisory liability claims against Kosmala and LaFramboise. Defendants argue that Plaintiff fails to allege personal involvement in the constitutional violation by either Kosmala or LaFramboise and fails to allege a sufficient causal connection between their conduct and the alleged constitutional deprivation. ECF 62 at 11. PPS Defendants argue that, even if Kosmala and LaFramboise were aware of student bullying on the bus prior to the incident on October 4, 2016, Plaintiff fails to allege that either Kosmala or LaFramboise had any reason to believe that Grappone was involved. *Id.* Rather, "Plaintiff's allegations seek to link Kosmala and LaFramboise to the student bullying, and then link student bullying to the bus driver's excessive force." *Id.*

Plaintiff alleges that Kosmala and LaFramboise had supervisory authority over Grappone and the safety conditions for students on the bus, ECF 57 at ¶ 181, and that Kosmala and LaFramboise "knew or should have been aware of [Grappone's] assaults of [Plaintiff] and the bullying and harassment [Plaintiff] was subjected to, possessed capacity to implement change necessary to stop assaults, and failed to do so," *id.* at ¶ 190. Plaintiff claims that Kosmala and LaFramboise failed to require Grappone receive training in safeholds for students with disabilities, failed to require Grappone have access to and an understanding of the students' Behavior Support Plans, and failed to require that an aide be placed on the bus to assist with managing student behavior. *Id.* at ¶¶ 188–91. Plaintiff further alleges that by "choosing to react," rather than prevent, unsafe student behavior on the bus, Kosmala and LaFramboise's actions and omissions "led directly to Grappone's inappropriate and assaultive actions" against Plaintiff on October 4, 2016. *Id.* at ¶ 193. Plaintiff argues that because Kosmala and LaFramboise were aware of student bullying, were aware of Grappone's lack of adequate training, and were aware

of Grappone's failure to manage unsafe student behavior, Kosmala and LaFramboise should have known that Grappone would deprive Plaintiff of his constitutional rights. ECF 66 at 12–13.

In this Court's Opinion and Order on PPS Defendants' first Motion to Dismiss, this Court found that none of the allegations contained in the First Amended Complaint suggest that Kosmala or LaFramboise knew of any alleged constitutional violations involving Grappone on the bus before the October 4, 2016 incident. ECF 52 at 13–14. The Second Amended Complaint contains additional factual allegations pertaining to the information known to Kosmala and LaFramboise. First, Plaintiff clarifies that Walker spoke with Kosmala "on multiple occasions between September and October 4, 2016" about student bullying and the need for an aide on the bus. ECF 57 at ¶ 25. Second, Plaintiff alleges that Walker spoke with LaFramboise following the October 4, 2016 incident and that LaFramboise reported that he had been aware of multiple incidents of unsafe student behavior on the bus prior to the October 4, 2016 incident. *Id.* at ¶ 35. LaFramboise informed Walker that, at times, PPS staff had met the bus en route to assist in managing student behavior and that he had, on multiple occasions, heard radio communications regarding disturbances on the bus and that he prepared to travel to meet the bus on many such occasions but decided not to. *Id.* at ¶¶ 39–40. In fact, LaFramboise had heard the radio call on October 4, 2016 and was preparing to travel to meet the bus, but was told not to by PPS Transportation. *Id.* at ¶ 41. Plaintiff also now alleges that Kosmala reported to Walker that she had, on several occasions, driven out to meet the bus en route to help manage student behavior and either ride on the bus or remove a child and drive the child back to the school. *Id.* at ¶¶ 37–38.

This Court finds that none of the new allegations contained in the Second Amended Complaint suggest that Kosmala or LaFrambroise knew or should have known about Grappone's

conduct toward Plaintiff until after the October 4, 2016 incident occurred. The Second Amended Complaint still alleges only that Kosmala and LaFrambroise were aware of student bullying on the bus by September 2016, at the earliest. *See id.* at ¶¶ 24–25. Indeed, Plaintiff only began riding the bus on September 6, 2016, which was the first day of the 2016 school year and less than one month before the incident in question. *Id.* at ¶ 23. And while Plaintiff also alleges that beginning on or around October 4, 2016, PPS staff members viewed video surveillance from Plaintiff's bus rides, *id.* at ¶ 55, there are no allegations that Kosmala or LaFramboise viewed video surveillance prior to the incident in question or regularly watched video surveillance from the bus. As with the First Amended Complaint, Plaintiff does not allege that Kosmala or LaFramboise were aware that Grappone was involved in any misconduct. *See Keates*, 883 F.3d at 1243 (holding that supervisory liability may be imposed when an official "knew of unconstitutional conditions and culpable actions of his subordinates but failed to act").

Moreover, at least with respect to Kosmala, Plaintiff does not allege that Kosmala failed to act. Rather, Plaintiff alleges that Kosmala was looking into placing an aide on the bus, *id.* at ¶ 26, offered to speak to parents and students to address student bullying on the bus, *id.* at ¶ 27, and drove to meet the bus en route to assist with managing student behavior, *id.* at ¶¶ 36–37. While these allegations demonstrate that Kosmala was aware of issues with student behavior on the bus, the allegations also show that Kosmala was taking steps to address and alleviate these issues—all within the first few weeks of the 2016 school year. These steps are inconsistent with acquiescence in Grappone's alleged misconduct and with reckless or callous disregard to Plaintiff's constitutional rights. *See Preschooler II*, 479 F.3d at 1183.

Nor does Plaintiff allege any personal involvement in the misconduct on the part of Kosmala or LaFramboise. *See Starr*, 652 F.3d at 1207 (citation omitted). Further, the Second

Amended Complaint again makes conclusory allegations that Kosmala and LaFramboise failed to train, supervise, or support Grappone, which directly caused the alleged unconstitutional conduct. ECF 57 at ¶¶ 186–87, 189. In fact, Plaintiff concedes that supervisors may only be held liable for the constitutional violations of government actors over whom they have "actual supervisory authority," ECF 66 at 10 (citing *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018)), and Plaintiff previously conceded that Plaintiff does not yet know "[w]hether Kosmala and La[F]ramboise had direct or tangential supervisory authority over Grappone." ECF 38 at 16. Plaintiff alleges that PPS's duties under state and federal law to provide transportation to students make Kosmala and LaFramboise the supervisors of Grappone, an employee of a contracted transportation provider, *id.* at 12, but alleges no additional facts from which this Court can infer that Kosmala or Laframboise had actual supervisory authority over Grappone. *See Felarca*, 891 F.3d at 820 (concluding that supervisors cannot be held liable for the constitutional violations of persons beyond their control or solely by virtue of their office).

This Court finds that the allegations against Kosmala and LaFramboise in Plaintiff's Second Amended Complaint are still too speculative and do not suffice to state a claim for supervisory liability. *See Iqbal*, 556 U.S. at 678 (explaining that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Twombly*, 550 U.S. at 555)); *see also Keates*, 883 F.3d at 1243 (finding allegations that a defendant "promulgated unconstitutional policies and procedures which authorized the particular conduct . . . and thus directly caused [another defendant's] allegedly unconstitutional conduct" were insufficient to state a claim of supervisory liability).

### 1.  Qualified Immunity

Nevertheless, even if this Court were to find for Plaintiff on the issue of supervisory liability, Plaintiff has failed to show why Kosmala and LaFramboise are not entitled to qualified

immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages . . . ." *Wood v. Moss*, 572 U.S. 744, 757 (2014) (citation omitted); *see also Krainski v. Nev. ex rel. Bd. of Regents*, 616 F.3d 963, 968 (9th Cir. 2010). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73 (2017) (per curiam) (internal quotation marks and citation omitted). The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). "To overcome qualified immunity, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). The plaintiff bears the burden of showing the right was clearly established. *Id.* The Ninth Circuit has explained that "[p]laintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [defendants] *in this case* that *their particular conduct* was unlawful." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). "To achieve that kind of notice, the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* (citation omitted).

Plaintiff has not met this burden. Plaintiff concedes that "[n]o binding caselaw currently exists in the Ninth Circuit that present facts substantively similar to the facts presented here." ECF 66 at 16. Instead, Plaintiff points this Court to a Seventh Circuit case in which police officers abandoned three children on an eight-lane highway after arresting their uncle. *Id.*; *see White v. Rochford*, 592 F.2d 381, 382 (7th Cir. 1979). One Seventh Circuit case that considers wholly unrelated facts is certainly not enough to have placed the constitutional

question at issue in this case beyond debate. This Court recognizes that government actors may still be on notice that their conduct violates established law in novel factual circumstances in obvious or egregious cases. *See Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001). This is not such an obvious or egregious case where, notwithstanding the lack of judicial guidance, Kosmala and LaFramboise's conduct was so clearly violative of a constitutional right that they should have known their actions were unconstitutional. Accordingly, PPS Defendants' Motion to Dismiss as to Plaintiff's supervisory liability claim for deliberate indifference against Kosmala and LaFramboise is GRANTED with prejudice.

**B. Claim 2.1: Deliberate Indifference Claim (*Monell*) against Defendant PPS**

Plaintiff also brings a deliberate indifference claim against Defendant PPS based on a *Monell* theory. The Supreme Court has held that in certain circumstances, a municipality may be held liable under Section 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691. Rather, "[p]ursuant to 42 U.S.C. § 1983, a local government may be liable for constitutional torts committed by its officials according to municipal policy, practice, or custom." *Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir. 2000) (citing *Monell*, 436 U.S. at 690–91).

To establish *Monell* liability based on deliberate indifference, a plaintiff must show the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality had a policy, longstanding practice, or custom; (3) the policy, practice, or custom amounted to "deliberate indifference to the plaintiff's constitutional right;" and (4) the policy, practice, or custom was "the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citation omitted). "[P]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*." *Gant v. Cnty. of Los*

*Angeles*, 772 F.3d 608, 618 (9th Cir. 2014) (citations omitted).

*Monell* liability can also arise from a failure to train, supervise, or discipline that amounts to a deliberate indifference to individuals' constitutional rights. *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). To show deliberate indifference, a plaintiff must demonstrate that the need "for more or different action is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (alteration in original) (internal quotation marks omitted).

PPS Defendants moves to dismiss Plaintiff's *Monell* claims because Plaintiff fails to allege that PPS, through Kosmala and LaFramboise, had actual knowledge that Grappone had reacted with excessive force prior to the October 4, 2016 incident. ECF 62 at 10. As a result, PPS Defendants contend that the Second Amended Complaint does not contain plausible factual allegations that PPS Defendants (1) "ignored facts about [Grappone's] excessive force" prior to the incident at issue, (2) "failed to train, supervise or reprimand [Grappone] after learning about [his] use of excessive force" prior to the incident at issue, or (3) "engaged in deliberate indifference" to Grappone's excessive force. *Id.* PPS Defendants further argue that Plaintiff does not allege constitutional harm resulting from a policy, practice, or custom. *Id.*

Plaintiff alleges that PPS is liable for Grappone's conduct under a *Monell* theory because Kosmala and LaFramboise failed to "implement[] safety measures designed to *prevent* unsafe student behaviors and assaultive bus driver restraints," failed to supervise train, and reprimand

Grappone, and failed to place an aide on the bus. ECF 57 at ¶¶ 147, 153–157. And further, through the actions or omissions of Kosmala and LaFramboise, PPS was allegedly deliberately indifferent to the bullying of Plaintiff, and these acts and omissions "constitute adoption of official practices, customs, and/or policies." *Id.* at ¶¶ 149, 151. Plaintiff also alleges that PPS "knew or should have known about the practices described . . . as these practices are so well settled as to constitute a custom or usage," "failed to take affirmative actions to prevent the actions alleged," and, in so doing, "ratified the actions of [] Grappone." *Id.* at ¶ 151. Plaintiff argues in his briefing that failures to correct a known problem constitute a practice, custom, or policy and that a policy, practice, or custom can likewise be established through PPS's "delegation of its statutory responsibility for the transportation of disabled children" to First Student "without instructions for safe transportation." ECF 66 at 4–5.

This Court finds that Plaintiff has failed to allege the existence of a policy, practice, or custom that amounted to deliberate indifference to Plaintiff's constitutional rights and that the policy, practice, or custom was the moving force behind the deprivation of Plaintiff's constitutional rights. Plaintiff's allegations regarding policies, practices, or customs are conclusory, and the Second Amended Complaint lacks well-pleaded facts that plausibly suggest these alleged policies, practices, and customs exist. Plaintiff states he is "aware of one specific incident" of "Grappone engag[ing] in physically assaultive and intimidating behavior"—the October 4, 2016 incident. ECF 57 at ¶ 15. Plaintiff references one additional incident that occurred in September 2016 where Grappone picked Plaintiff up and returned him to his seat on the bus without employing an "approved method of safe holds for restraining a child in

emotional meltdown." *Id.* at ¶¶ 74–75.[3] However, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*," *Gant*, 772 F.3d at 618 (citations omitted), nor are "isolated or sporadic incidents." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Nor has Plaintiff argued that this single incident of misconduct falls within the "narrow range of circumstances" in which single-incident liability has been found. *See Bryan Cnty.*, 520 U.S. at 409. Plaintiff's allegations regarding failure to train, supervise, or discipline are also insufficient to amount to the "stringent" deliberate indifference standard. *See id.* at 410. As stated above, Plaintiff only began riding the bus less than one month before the October 4, 2016 incident and does not allege that Kosmala, LaFramboise, or any other PPS staff were aware of any other incidents involving Grappone prior to the October 4, 2016 incident. Accordingly, this Court cannot conclude that PPS ignored risks so known or obvious as to amount to deliberate indifference. This Court finds that Plaintiff has failed to state a claim for deliberate indifference based on official policy, practice, or custom or on failure to train, supervise, or discipline.

---

[3] Plaintiff also concedes that it is not clear when this second incident even occurred, alleging that the incident took place either on September 20, 2016 or October 9, 2016. ECF 57 at ¶ 73. If the incident took place on October 9, 2016, it would have occurred *after* the incident at issue. And as this Court noted in its previous Opinion and Order, *see* ECF 52 at 21 n.14, Plaintiff attempts to supplement the incidents by pleading that "upon information and belief," Grappone "likely was assaultive to [Plaintiff] on prior occasions." ECF 57 at ¶ 15. Though the Ninth Circuit has found that a plaintiff may plead facts based on information and belief, the court explained that this applies "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (citations omitted). The relevant facts regarding an alleged pattern of assault on Plaintiff by Grappone are not known only by Defendants—Plaintiff himself would be in possession of any such facts. Moreover, Plaintiff includes no factual allegations as to conduct related to other students or by other bus drivers which may indicate a widespread policy, practice, or custom. *See Pozos Leon v. Tillamook Cnty. Sch. Dist.*, No. 3:17-440-PK, 2018 WL 2175949, at *7 (D. Or. May 11, 2018) (noting that where school district and its employees "knew that [student transportation] policies were not being followed and that similar incidents to what happened to [the child] happen 'four or five times a year'").

In his response, Plaintiff raises two additional arguments. Plaintiff argues that while the Fourteenth Amendment does not generally impose a duty on the state to protect individuals from third parties, there are two exceptions to this rule that apply in this case: (1) when a special relationship exists between the plaintiff and state and (2) when the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known or obvious danger. ECF 66 at 5–6 (citing *Patel v. Kent Sch. Dist.*, 648 F.3d 965 (9th Cir. 2011)). Plaintiff argues that PPS is in a special relationship with Plaintiff based on the "*in loco parentis*" doctrine, *id.* at 6, and that the environment on the bus constituted a state-created danger, *id.* at 8.

### 1. Special Relationship

The special relationship exception applies when a state "takes a person into its custody and holds him there against his will." *Patel*, 648 F.3d at 972 (quoting *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). The types of custody that trigger the special relationship exception are "incarceration, institutionalization, or other similar restraint of personal liberty." *Id.* (citation omitted). "When a person is placed in these types of custody, [courts] allow due process claims against the state for a fairly simple reason: a state cannot restrain a person's liberty without also assuming some responsibility for the person's safety and well-being." *Id.* (citation omitted). The exception does not apply in cases where a person is not in state custody. *Id.*

School personnel do act in a surrogate parent role, or *in loco parentis*, to protect children who attend their school. *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). However, the Ninth Circuit has explained that "combining *in loco parentis* duties with compulsory school attendance still does not create a 'special relationship.'" *Patel*, 648 F.3d at 973 (citations omitted). In fact, in *Patel*, the Ninth Circuit held that a disabled minor child with mandatory school attendance and a tailored educational program is not in "custody" at school. *Id.*

("Compulsory school attendance and *in loco parentis* status do not create 'custody' . . . In the case of a minor child, custody does not exist until the state has so restrained the child's liberty that the parents cannot care for the child's basic needs . . . A tailored educational program for a disabled student does not meet this threshold." (citations omitted)).

Plaintiff argues that he was in a special relationship with PPS based on the *in loco parentis* doctrine such that that PPS had a duty and responsibility to keep him safe from harm on the bus. ECF 66 at 7. However, Plaintiff cites no controlling legal authority for this argument. The cases cited by Plaintiff consider state law negligence claims—not Fourteenth Amendment claims. *Id.* at 6–7 (citing *Fazzolari By & Through Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 20 (1987); *Shin v. Sunriver Preparatory Sch., Inc.*, 199 Or. App. 352, 365–66 (2005); *Conway v. Pacific University*, 324 Or. 231, 239–40, (1996)); *see also id.* at 6 (citing *Pangle v. Bend-Lapine Sch. Dist.*, 169 Or. App. 376, 395 (2000) (considering whether a special relationship existed for a First Amendment claim)). Moreover, the Ninth Circuit in *Patel* expressly rejected the special relationship argument that Plaintiff now makes. Plaintiff, a disabled child with a tailored educational program, was not in state custody under the Fourteenth Amendment at PPS. Accordingly, PPS did not have a duty to protect Plaintiff from Grappone based on the special relationship exception.

### 2.  State-Created Danger

Plaintiff also argues that PPS had a duty to protect Plaintiff from Grappone based on the state-created danger exception. In order to state a claim for state-created danger, a plaintiff must allege the following: (1) "affirmative conduct on the part of the state in placing the plaintiff in danger," and (2) "deliberate indifference" on the part of the state with respect to "known or obvious danger." *Patel*, 648 F.3d at 974 (quoting *Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1086 (9th Cir. 2000) and *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)). The

Ninth Circuit has explained that "the standard [for state-created danger] is even higher than gross negligence." *Id.* Deliberate indifference for the state-created danger exception "requires a culpable mental state" where "the defendant knows that something *is* going to happen but ignores the risk and exposes [the plaintiff] to it." *Id.* (alteration in original) (citation omitted).

This Court finds that Plaintiff has failed to allege sufficient facts under the state-created danger exception. Plaintiff does not allege the PPS took affirmative steps to place Plaintiff in danger. Indeed, Plaintiff expressly states that PPS failed to "prevent" the unsafe conditions that allegedly caused Plaintiff's constitutional deprivation. ECF 57 at ¶¶ 147, 149. Moreover, Plaintiff has failed to allege facts that amount to a standard higher than gross negligence on the part of PPS. As this Court has explained, Plaintiff does not allege that any PPS staff knew about any incidents involving Grappone prior to the October 4, 2016 incident. Plaintiff has therefore failed to allege that PPS knew something *was* going to happen, but nonetheless exposed Plaintiff to the risk. PPS did not have a duty to protect Plaintiff from Grappone based on the state-created danger exception. Accordingly, PPS Defendants' Motion to Dismiss as to Plaintiff's *Monell* claim for deliberate indifference against PPS is GRANTED with prejudice.

## C.  Claim 1.1: Excessive Force Claim (*Monell*) Against Defendant PPS

Finally, Plaintiff alleges that PPS has a "policy, practice, and/or custom of excusing, condoning, and concealing the unlawful use of unnecessary and/or excessive force against children, particularly children of color and/or children with disabilities." ECF 57 at ¶ 108. Plaintiff also claims that PPS "failed to act and failed to put in place policies" that would have protected Plaintiff from harm. *Id.* As with the deliberate indifference claims, Plaintiff alleges that through the actions and omissions of Kosmala and LaFramboise, PPS had "actual knowledge or reason to know that the student interactions on [the bus] were unsafe, and that Grappone had reacted to [Plaintiff's] behavior with excessive force on at least one occasion, following several

previous improper holds and restraints against [Plaintiff]."[4] *Id.* at ¶ 106. PPS Defendants again argue that the Second Amendment Complaint "does not allege that any custom, policy, or practice of PPS's resulted in a deprivation of [P]laintiff's constitutional rights." ECF 62 at 7.

Plaintiff's *Monell* claim based on excessive force fails for the same reason as Plaintiff's *Monell* claim for deliberate indifference. Plaintiff has not sufficiently alleged the existence of a policy, practice, or custom. Plaintiff alleges that he is "aware" of only one incident of excessive force—the October 4, 2016 incident in question. ECF 57 at ¶ 15. Plaintiff references only one additional incident that may have occurred in September 2016 where Grappone allegedly employed an improper hold on Plaintiff. *Id.* at ¶¶ 74–75. However, this Court finds that one prior incident involving Grappone is not enough to establish that PPS had a policy, custom, or practice of exposing Plaintiff to excessive force on the part of Grappone. *See Gant*, 772 F.3d at 618; *Trevino*, 99 F.3d at 918. Furthermore, as repeatedly addressed above, Plaintiff fails to allege that any PPS personnel were aware of the alleged excessive force on the part of Grappone. This Court finds that Plaintiff has failed to allege an official policy, practice, or custom of excusing, condoning, and concealing the allegedly unlawful use of excessive force by Grappone against Plaintiff. Accordingly, PPS Defendants' Motion to Dismiss as to Plaintiff's *Monell* claim for excessive force against PPS is GRANTED with prejudice.

## CONCLUSION

This Court GRANTS PPS Defendants' Motion to Dismiss Plaintiff's Second Amended

---

[4] As this Court noted above, Plaintiff references only one additional incident involving Grappone that occurred either on September 20, 2016 or on October 9, 2016, ECF 57 at ¶¶ 73–75, and attempts to supplement the incidents by pleading that "upon information and belief," Grappone "likely was assaultive to [Plaintiff] on prior occasions," *id.* at ¶ 15. Because the relevant facts regarding Grappone's alleged pattern of assault on Plaintiff would be known by Plaintiff, Plaintiff may not plead these facts based on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017).

Complaint, ECF 62, with prejudice as to all claims against Defendants PPS, Kosmala, and LaFramboise. Accordingly, PPS Defendants are hereby DISMISSED from this action.

      **IT IS SO ORDERED**.

      DATED this 27th day of April, 2023.

                                  /s/ Karin J. Immergut
                                  Karin J. Immergut
                                  United States District Judge